| | |
|---|---|
| Minute Order Form (06/97) | |

SC

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6510 | **DATE** | 11/6/2002 |
| **CASE TITLE** | CAROLYN MCCOLLOUGH vs. PAUL H. O'NEILL | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Status hearing held. Enter Memorandum Opinion And Order. Defendants' motion for summary judgment is granted. Plaintiff's motion to file modified pretrial order is moot. All pending motions and dates are moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | NOV 0 8 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 30 |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 02 NOV -7 AM 9:07 | date mailed notice | |
| LG | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CAROLYN MCCOLLOUGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 01 C 6510 |
| v. | ) | |
| | ) | Honorable John W. Darrah |
| | ) | |
| PAUL H. O'NEILL, Secretary, | ) | |
| Department of the Treasury, | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED
NOV 0 8 2002

## MEMORANDUM OPINION AND ORDER

Plaintiff, Carolyn McCollough ("Plaintiff"), filed a two-count complaint against Defendant, Paul H. O'Neill, the Secretary of the Treasury ("Defendant"), alleging violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000(e) *et seq.*, and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* Defendant moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment. For the reasons that follow, Defendant's motion for summary judgment is granted.

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine

30

issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

## BACKGROUND

The undisputed facts taken from the parties' Local Rule 56.1(a) & (b) statements of material facts[1] (referred to herein as "Pl.'s 56.1" and "Def.'s 56.1") and exhibits are as follows.

Plaintiff was employed by the Internal Revenue Service ("IRS"). (Def.'s 56.1 ¶ 1.) Plaintiff is a fifty-two-year-old African-American woman who practices Judaism. (Def.'s 56.1 ¶ 3.)

In 1999, the IRS Office of the National Taxpayer Advocate underwent a comprehensive

---

[1] A court may strike 56.1 statements in their entirety when they contain evasive answers and improper argument as such tactics defeat the purpose for which Rule 56.1 was implemented. *Bordelon v. Chicago School Reform Board of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000). All 56.1 responses which fall into this category are deemed admitted.

reorganization and restructuring. (Def.'s 56.1 ¶ 9.) This involved changing the organization and reporting structure of the Office of the National Taxpayer Advocate and the duties associated with many individual positions. (Def.'s 56.1 ¶ 9.) All new positions in the new organization, called the Taxpayer Advocate Service, were subject to competitive selection. (Def.'s 56.1 ¶¶ 9, 10.) The Taxpayer Advocate Service is a Congressionally-mandated, independent arm of the IRS, which is charged with the duty of advocating within the IRS on behalf of individual taxpayers who have disputes with the IRS. (Def.'s 56.1 ¶ 8.)

The Restructuring and Reform Act of 1998 mandated that the new organization function independently of the rest of the IRS. (Def.'s 56.1 ¶ 11.) Under the previous organization, Problem Resolution Officers were located in districts around the country and were responsible for the Taxpayer Advocate program in their district. (Def.'s 56.1 ¶ 11.) The Problem Resolution Officers reported to district management who were responsible for all aspects of IRS operations in their geographic area. (Def.'s 56.1 ¶ 11.) Under the Taxpayer Advocate Service, the position of Problem Resolution Officer was replaced by a new position called Local Taxpayer Advocate. (Def.'s 56.1 ¶ 12.) The new Local Taxpayer Advocates do not report to operational management but, rather, report to Area Directors within the Taxpayer Advocate Service. (Def.'s 56.1 ¶ 12.) These Area Directors in turn report to the National Taxpayer Advocate in Washington, D.C. (Def.'s 56.1 ¶ 12.) Under the new system, an advocate operates independently of any other IRS offices and reports directly to Congress through the National Taxpayer Advocate. (Def.'s 56.1 ¶ 12.)

These changes significantly altered the scope of the Local Taxpayer Advocate position. (Def.'s 56.1 ¶ 13.) Taxpayer Advocate employees and management would no longer rely on the decisions and recommendations of IRS operational functions to determine the best recourse for a

taxpayer's situation. (Def.'s 56.1 ¶ 13.) The new Local Taxpayer Advocate position would require more technical expertise and would involve negotiating with IRS functions. (Def.'s 56.1 ¶ 13.) Under the new organization, the Local Taxpayer Advocates also acquired the discretion not to inform the IRS operational managers of any contact with or information provided by taxpayers. (Def.'s 56.1 ¶ 14.)

Under the old organization, supervision and management of employees working Problem Resolution cases varied district by district. (Def.'s 56.1 ¶ 15.) In Chicago, caseworkers were detailed to the Taxpayer Advocate's Office on a rotational basis, and the Problem Resolution Officer was not responsible for evaluating those employees. (Def.'s 56.1 ¶ 15.) Under the new organization, the Local Taxpayer Advocates assumed direct responsibility for all aspects of managing and evaluating subordinate employees. (Def.'s 56.1 ¶ 15.)

In the course of the reorganization, a committee was appointed, which, over the course of six months, designed a blueprint for the new organization to comply with the mandates of the Restructuring and Reform Act. (Def.'s 56.1 ¶ 18.) This involved new position descriptions and a new structure. (Def.'s 56.1 ¶ 18.) The five Regional Taxpayer Advocate positions were abolished. (Def.'s 56.1 ¶ 19.) In their place, nine Area Director positions were created and, like all positions in the new organization, announced for competitive selection. (Def.'s 56.1 ¶ 20.) The Area Directors were to be responsible for managing the Local Taxpayer Advocates within their areas. (Def.'s 56.1 ¶ 20.) The Area Director positions were filled in May or June 1999. (Def.'s 56.1 ¶ 21.)

The position of Problem Resolution Officer, Position Description Number 92290E, was also abolished and replaced by the position of Local Taxpayer Advocate, Position Description Number 92495. (Def.'s 56.1 ¶ 22.) The existing Problem Resolution Officers level GS-14, like Plaintiff,

began to be called by the new name, "Local Taxpayer Advocates". (Def.'s 56.1 ¶ 23.) All seventy-four Local Taxpayer Advocate positions were announced for competitive selection in May 1999 and selected after the Area Directors were filled. (Def.'s 56.1 ¶ 24.) The former Problem Resolution Officers were allowed to apply for the new jobs but had to compete for them. (Def.'s 56.1 ¶ 25.) While the former Problem Resolution Officers might not obtain positions as Local Taxpayer Advocates under the new structure, they were assured of placement within the IRS at the same grade and pay. (Def.'s 56.1 ¶ 26.)

Henry Lamar ("Lamar"), the Deputy National Taxpayer Advocate, was responsible for gathering information about the applicants and making a recommendation to Val Oveson ("Oveson"), the National Taxpayer Advocate. (Def.'s 56.1 Ex. 1 at 2.) For some districts, the selections were made based on the written applications alone; but for most districts, candidates were interviewed by a panel of at least two IRS managers. (Def.'s 56.1 Ex. 1 at 2.) The Area Taxpayer Advocate and Lamar, with Oveson's concurrence, made the decision whether to interview candidates for a particular position. (Def.'s 56.1 ¶ 30.)

The interviews were conducted over a period of approximately three weeks in the Summer of 1999 in Washington, D.C. (Def.'s 56.1 ¶ 31.) Lamar did not participate in most of the interviews. (Def.'s 56.1 ¶ 32.) All interviewers asked candidates the same questions and communicated the results of the interviews to Lamar. (Def.'s 56.1 ¶ 33.) As the interviews were completed for the various Local Taxpayer Advocate positions, Lamar made his recommendations to Oveson; and within about two weeks after the conclusion of the interviews, selections were made for almost all of the seventy-four Local Taxpayer Advocate positions around the country. (Def.'s 56.1 ¶ 34.) In addition to serving as the recommending official for all seventy-four Local Taxpayer Advocate

positions, Lamar also served as the recommending official for nine Area Director positions and four National Office Director positions and as the selecting official for thirty Area Analyst positions. (Def.'s 56.1 ¶ 35.) Lamar's recommendations were based on his review of the application packages, which included the applicants' most recent evaluations, the interview results, and other information which Lamar had about the applicants either from his personal experience or from conversations with local management. (Def.'s 56.1 ¶ 36.)

Plaintiff was detailed to the position of Problem Resolution Officer, the predecessor of the Local Taxpayer Advocate, in January 1998 and was officially assigned to the position two months later. (Def.'s 56.1 ¶ 37.)

In October 1998, when the reporting structure within the organization changed so that the Regional Taxpayer Advocates were responsible for managing the employees within their regions, Plaintiff began to report to Olga Rhodes, the Regional Advocate for the Midstates Region. (Def.'s 56.1 ¶ 38.) Rhodes' position, the Midstates Regional Advocate, was located in Dallas, Texas, and included responsibility for twelve states, one of which was Illinois. (Def.'s 56.1 ¶ 40.)

Before she assumed the position of Regional Taxpayer Advocate, Rhodes' predecessor in the job briefed her about the status of each of the fifteen offices for which she was responsible. (Def.'s 56.1 ¶ 42.) Of the fifteen local taxpayer officers under Rhodes' jurisdiction, the Chicago office was the most troubled. (Def.'s 56.1 ¶ 43.) In August 1998, immediately after assuming the position of Regional Taxpayer Advocate, Rhodes spoke with Plaintiff about the problems in her office and asked her to submit an action plan to address those problems. (Def.'s 56.1 ¶ 44.)

Plaintiff sent Rhodes a copy of the action plan via facsimile on August 11, 1998. (Def.'s 56.1 ¶ 45.) At that time, Rhodes spoke to Plaintiff's supervisor, Mary Davis, Acting District Director in

Illinois, and the Regional Chief Compliance Officer, Dale Hart ("Hart"), to enlist their help in providing Plaintiff with support to carry out the action plan and resolve the issues in the Chicago Office. (Def.'s 56.1 ¶ 46.)

In late 1997, Senator Roth, Chairman of the Senate Finance Committee, invited taxpayers nationwide to write to him to report any allegations of malfeasance by the IRS, and the Senate Finance Committee conducted related hearings. (Def.'s 56.1 ¶ 47.) In September 1998, the IRS Compliance Office mandated a nationwide review of cases in which complaints had been made to the Senate Finance Committee. (Def.'s 56.1 ¶ 47.) Rhodes worked with Hart and formed a team of individuals who conducted a 100% review of all Senate Finance Committee cases in the Midstates Region. (Def.'s 56.1 ¶ 48.)

The review for the Illinois District took place in September and October 1998. (Def.'s 56.1 ¶ 48.) The review concluded that there was a need for extensive additional work on cases and improvement in the timeliness of taxpayer contact and case follow-up. (Def.'s 56.1 ¶ 49.) The review also concluded that there was a need for a Taxpayer Advocate presence in casework. (Def.'s 56.1 ¶ 49.)

The issues with regard to the timeliness and quality of the casework in the Chicago office were also documented in Plaintiff's midyear review conducted in May 1999 by Mary Ellen Ledger ("Ledger"), who had been detailed to serve in Rhodes' position while Rhodes was detailed in Washington, D.C. (Def.'s 56.1 ¶¶ 50, 51.) Rhodes kept in touch with operations in the region through discussions with Ledger but did not have day-to-day involvement in the affairs of the region between January and September 1999. (Def.'s 56.1 ¶ 52.) Under the heading "Increase Productivity", the midyear review stated:

> You have had many obstacles in this area. You stated the inventory is aged and have been working to ensure cases are processed in a timely and quality manner. You have taken several actions to help with this effort. You have been aggressive in identifying non-performers and either correcting deficiencies or returning them to the functions. You have been working to develop the analytical skills of staff members. Your staff is largely new to [the] P[roblem] R[esolution] P[rogram]. You have worked with four different managers in the PSD group and two in the PRP blended group. The turnover of managers and employees has been a concern. To help alleviate this problem, you implemented a process to identify caseworkers for one-year competitive details.

(Def.'s 56.1 Ex. 9.) The problems with the quality and the timeliness of cases still existed in May 1999, as documented in the follow-up status report on the Senate Finance Committee cases. (Def.'s 56.1 ¶ 53.) The report also noted that:

> we recognize the improvement in casework and the challenges associated with this endeavor. We appreciate the continued oversight by the Local Taxpayer Advocate and District Leaders in ensuring [Senate Finance Committee] cases receive priority attention. We commend the quality customer service DeLois Carrethers, Taxpayer Advocate Analyst, has provided to taxpayers and district employees. Her knowledge of SFC cases and her commitment to working with the functions was clearly documented in the case files and observed during our discussions.

(Def.'s 56.1 Ex. 4 at 66.)

The position of Local Taxpayer Advocate (Program Manager) in Chicago, Illinois was announced for competitive selection on May 10, 1999. (Def.'s 56.1 ¶ 56.) Seven people, including Plaintiff, applied for the vacancy, which closed to applicants on May 19, 1999. (Def.'s 56.1 ¶ 57.) Two applicants did not submit required paperwork and were disqualified from consideration. (Def.'s 56.1 ¶ 58.) Applicants are ranked in the National Taxpayer Advocate function when there are more than five applicants. (Def.'s 56.1 ¶ 59.) The application packages of these five remaining employees, one of which was Plaintiff, were sent for consideration without being ranked. (Def.'s 56.1 ¶ 59.)

Each applicant was interviewed as part of the selection process. (Def.'s 56.1 ¶ 60.) Plaintiff

did well during her interview, receiving a rating of "must have". (Def.'s 56.1 ¶ 61.) This rating meant that the panel had no concerns about the applicant's abilities to perform in the position. (Def.'s 56.1 Ex. 1 at 2.) One of Plaintiff's interviewers, David Cook, stated that:

> there were two other candidates who had good interviews. However, there were areas in their interviews where the answers could have been better and they did not demonstrate the experience that was desired. One of these candidates was rated a "maybe" and the other was rated as a "no." Neither of the candidates did as well as the [Plaintiff] during their interviews.

(Def.'s 56.1 Ex. 12 at 4-5.)

Prior to making a decision, Lamar spoke with the newly-selected Chicago Area Director, Elayne Goldstein ("Goldstein"), who would supervise the new Local Taxpayer Advocate in Chicago. (Def.'s 56.1 ¶ 62.) Lamar spoke with Rhodes; Robert Brazzil ("Brazzil"), the District Director for the Illinois District; and with Plaintiff's interviewers, David Cook ("Cook") and Virgie Noel ("Noel"). (Def.'s 56.1 ¶ 62.) Brazzil referred Lamar to Plaintiff's supervisors in the region. (Pl.'s 56.1 Ex. 3 at 10.) Goldstein did not have personal knowledge of Plaintiff's performance, but she advised Lamar that, based on her conversations with Rhodes, there were concerns about Plaintiff's performance with respect to the management of the Senate Finance Committee cases assigned to the Chicago District. (Def.'s 56.1 ¶ 67.)

Lamar and Goldstein then agreed that they should give themselves the opportunity to look at other candidates. (Def.'s 56.1 ¶ 68.) After the interviews were conducted, Lamar recommended, and Oveson determined, to "non-select" the position, that is not to make a selection for the Chicago Taxpayer Advocate position at that time. (Def.'s 56.1 ¶ 69.) Lamar made his recommendation because he was not convinced that any of the five candidates were ideal for the job, and he wanted the opportunity to look at other candidates. (Def.'s 56.1 ¶ 71.)

Agency management has the discretionary authority in all vacancy announcements to non-select a package for any reason. (Def.'s 56.1 ¶ 72.) When a position was non-selected, it would be re-announced; and the existing, as well as other, candidates would be allowed to reapply. (Def.'s 56.1 ¶ 74.)

In other instances, including instances in the 1999 reorganization of the Taxpayer Advocate function, other decisions were made to non-select a group of candidates and re-announce the positions. (Def.'s ¶ 75.) In some instances, candidates from the first group reapplied when the position was re-announced and were ultimately selected for the position. (Def.'s 56.1 ¶ 75.)

Specifically, Lamar and Oveson also made the decision to non-select a group of candidates for the Birmingham, Alabama Local Taxpayer Advocate position. (Def.'s 56.1 ¶ 76.) The position was then re-announced and applications were solicited for a second time. (Def.'s 56.1 ¶ 76.) The incumbent of the predecessor position, former Problem Resolution Officer Margaret Gilchrist ("Gilchrist"), was one of the applicants in the initial group and, like Plaintiff, was not selected on the initial round. (Def.'s 56.1 ¶ 76.) When the position was re-announced, Gilchrist applied again and was selected for the position. (Def.'s 56.1 ¶ 76.) Lamar and Oveson made the decision to non-select groups of candidates for Area Director positions in New York and California. (Def.'s 56.1 ¶ 77.) The positions were then re-announced, and applications were solicited for a second time. (Def.'s 56.1 ¶ 77.) In Oakland, California, the incumbent of the predecessor position, Joe Benton ("Benton"), was one of the applicants in the initial group. (Def.'s 56.1 ¶ 77.) When the position was re-announced, Benton applied again and was selected for the position. (Def.'s 56.1 ¶ 77.)

The decision to non-select the Chicago position did not preclude the possibility that Plaintiff could ultimately be selected. (Def.'s 56.1 ¶ 73.) After the decision was made to non-select the

-10-

Chicago position, Oveson called Plaintiff to tell her that the position was being non-selected and encouraged her to reapply when the position was re-announced. (Def.'s 56.1 ¶ 78.) Plaintiff asked Oveson why the decision had been made, and Oveson told her she would have to discuss this with the interview panel or with Lamar. (Def.'s 56.1 ¶ 79.)

Plaintiff also spoke with Lamar, who told her that she had an excellent interview and stated that "The jury is still out on you." (Def.'s 56.1 ¶ 80.) Plaintiff asked why she had not been selected on the application she had already submitted, and Lamar told her that he had gotten feedback that she had problems with managing her inventory, specifically the Senate Finance Committee cases, and with accepting constructive criticism. (Def.'s 56.1 ¶ 82.) Lamar told Plaintiff that there could be mitigating reasons for her problems with her inventory and encouraged her to reapply for the position. (Def.'s 56.1 ¶¶ 81, 82.)

The Local Taxpayer Advocate (Program Manager) position in Chicago was re-announced on July 26, 1999. (Def.'s 56.1 ¶ 83.) Applications had to be submitted by August 4, 1999. (Def.'s 56.1 ¶ 83.) Ten employees applied with two applicants being disqualified for failure to submit required paperwork. (Def.'s 56.1 ¶ 84.)

However, Plaintiff did not apply. (Def.'s 56.1 ¶ 85.) The ultimate selectee was Joseph Aceto ("Aceto"), a forty-six year-old white male. (Def.'s 56.1 ¶ 86.) Because Plaintiff did not reapply for the position when it was re-announced, she never competed directly against Aceto; and Lamar and Oveson never compared her qualifications to those of Aceto. (Def.'s 56.1 ¶ 88.)

Plaintiff retained her grade and pay and was detailed to the Examination Division. (Def.'s 56.1 ¶ 91.) Plaintiff retired from the IRS early. (Def.'s 56.1 ¶ 91.)

## DISCUSSION

Plaintiff may prove discrimination under Title VII or the ADEA through direct evidence or indirectly through the burden-shifting mechanism of *McDonnell Douglas*.[2] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In this case, Plaintiff has presented no direct evidence of discrimination. Direct evidence of intentional discrimination entails proof of acknowledgment by the Defendant of a discriminatory motive. *Troupe v. May Department Store*, 20 F.3d 821, 823 (7th Cir. 1994).

To prove discrimination indirectly, Plaintiff must establish that: (1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) despite her qualifications, she was rejected; and (4) after her rejection, the position remained open, and the employer continued to seek applicants from persons of her qualifications. *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973); *see also Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981).

Defendant argues that summary judgment is appropriate because (1) Plaintiff cannot state a *prima facie* case of discrimination when Plaintiff abandoned her application before any final decision was reached and did not suffer any material adverse job consequences and (2) there is no evidence of discriminatory intent.

The evidence presented does not establish all of the elements of a *prima facie* case of

---

[2] Under the *McDonnell Douglas* framework, a *prima facie* case of employment discrimination creates a rebuttable presumption that employer's actions, if unexplained, were the result of impermissible factors and shifts the burden of production to the employer to articulate some legitimate, nondiscriminatory reason for its actions; if the employer satisfies that burden, Plaintiff must then show that articulated reasons were pretextual. *Hong v. Children's Memorial Hospital*, 993 F.2d 1257, 1261 (7th Cir. 1994).

discrimination. Plaintiff is a member of a protected class. She is a fifty-two-year-old African-American woman. It is undisputed that Plaintiff applied for the position of Chicago Local Taxpayer Advocate.

However, Plaintiff cannot establish a *prima facie* case of discrimination because she was never "rejected" for the position. Based on comments he had received from Brazzil regarding Plaintiff's ability to respond to constructive criticism, Lamar recommended "non-selecting" the position of Chicago Taxpayer Advocate; and Oveson agreed not to make any selection for that position. Lamar further stated that he made that recommendation because he was not convinced that any of the five candidates were ideal for the job and he wanted an opportunity to look at other candidates. "Non-selecting" the position did not preclude the possibility that Plaintiff could be selected for the position if she reapplied. The decision to "non-select" the position merely meant that the IRS was not going to make a selection at that time and contemplated that, when the position was reannounced, the existing candidates, including Plaintiff, would be allowed to reapply. If no one more qualified applied for the position, an original applicant who reapplied could be selected. However, Plaintiff chose not to reapply and participate in the second selection process.

The evidence presented establishes that the decision to "non-select" the position was not unusual. Lamar and Oveson had decided to non-select a group of candidates for the Birmingham, Alabama Taxpayer Advocate position. When that position was re-announced, Gilchrist, the incumbent who had not been selected the first time around, reapplied and was selected for the position. Lamar and Oveson also made the decision to "non-select" the Area Director position in Oakland, California. When that position was reannounced, Benton, the incumbent who had not been selected in the previous round of applications, reapplied for the position and was selected for the

-13-

position of Area Director.

To the contrary, Plaintiff did not reapply for the position of Chicago Taxpayer Advocate when it was reannounced even though Lamar and Oveson encouraged her to do so. Therefore, Plaintiff is unable to establish a *prima facie* case of discrimination. She was never ultimately rejected for the position but elected, instead, not to reapply and participate in the selection process that finally produced a person selected for the position she previously sought.

Moreover, Plaintiff suffered no adverse employment action because, even though she was not selected for the Chicago Taxpayer Advocate Position, she was assured to receive an equivalent position at the same grade and pay but chose to retire.

Even assuming Plaintiff established a *prima facie* case of discrimination, she could not succeed on summary judgment because of her failure to show that Defendant's legitimate articulated reason for not selecting her for the position of Chicago Taxpayer Advocate was pretextual. "A plaintiff can establish pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's explanation is unworthy of credence." *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998). An honest belief in the non-discriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or baseless. *Debs*, 153 F.3d at 396.

Defendant's proffered reason for not choosing Plaintiff to fill the position of Chicago Taxpayer Advocate is that: (1) Lamar and Oveson decided to "non-select" the position due to concerns about her performance and (2) she did not reapply for the position when it was reannounced. Lamar stated that he and Goldstein decided to "non-select" the position because they wanted the opportunity to look at other candidates. Lamar further stated that he recommended to

Oveson to "non-select" the position because he was not convinced that any of the five candidates were ideal for the job.

It is undisputed that Rhodes and Brazzil expressed to Lamar their concerns over the timeliness and quality of Plaintiff's work and inventory management and her ability to accept and act upon constructive criticism. Her mid-year review by Ledger also noted the problems with timeliness and quality. Moreover, Plaintiff has not presented any evidence that the concerns over timeliness and quality did not, or were insufficient to, motivate the decision to recommend "non-selection" of the position of Chicago Taxpayer Advocate. The fact that Plaintiff was the most qualified in her group of candidates, none of whom were selected, does not mean that she was the most qualified for the job among all possible applicants, including those who applied during the second selection process.

Pretext "means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). As was discussed in greater detail above, Lamar and Oveson had "non-selected" positions in other cities. In those cases, the incumbent who was not initially selected, unlike Plaintiff, reapplied and was ultimately selected for the position. Plaintiff has not presented any evidence from which a rational jury could conclude that Defendant's proffered reason for not selecting Plaintiff was pretextual, i.e. that Lamar or Oveson were lying. Therefore, Defendant's Motion for Summary Judgment is granted.

## CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment is granted.

**IT IS SO ORDERED.**

John W. Darrah, Judge
United States District Court

Date: November 6, 2002